**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **KRISTY McCANN, individually and derivatively on behalf of SKILLCYCLE, INC.,** <br><br> *Plaintiff,* <br><br> v. <br><br> **BIP VENTURES, L.P.; BIP VENTURES MANAGEMENT, LLC; MARK BUFFINGTON; and SKILLCYCLE, INC.,** <br><br> *Defendants.* | **Civil Case No.** _____ <br><br><br> **VERIFIED COMPLAINT** <br> **& JURY DEMAND** |

## NATURE OF THE ACTION

1.      This action seeks redress for a systemic, malicious, and bad-faith scheme orchestrated by a predatory venture capital firm, Defendant BIP Ventures, and its principals, to illegally strip Plaintiff Kristy McCann, the visionary founder and CEO of SkillCycle, Inc., of her company, her foundational equity, and her professional reputation.

2.      Rather than acting as a legitimate investment partner, Defendants executed a calculated "loan-to-own" playbook of shareholder oppression. Through a series of coercive tactics, Defendants systematically starved the Company of board-approved capital, forced predatory "pay-to-play" financing rounds, and unilaterally altered binding investment agreements to manufacture financial distress. This extortionate scheme was designed to intentionally depress the Company's valuation and wrongfully dilute Ms. McCann's equity from approximately 80 percent down to roughly 4 percent, entirely for the benefit of BIP and its preferred stockholders.

1

3.      When Ms. McCann refused to step down and capitulate to these abusive tactics, Defendants escalated their misconduct. Following a formal request by an independent board member for a governance and financial audit of BIP's overreach, Defendants executed a hostile board coup. They improperly converted millions of preferred shares to common stock to subvert corporate democracy, seized control of the board, and effectuated Ms. McCann's retaliatory termination just days later.

4.      Defendants' misconduct did not end with her termination. To manufacture retroactive leverage and justify their bad-faith actions, Defendants engaged in blatant invasions of privacy by directing the newly installed interim CEO to covertly access and search Ms. McCann's previously deleted email account for "compromising" material. Furthermore, Defendants maliciously defamed Ms. McCann to outside investors, employees, and third parties by falsely accusing her of "fraud", a baseless claim explicitly refuted by the Company's own Controller.

5.      Adding to these severe corporate and tortious abuses, Defendant Mark Buffington subjected Ms. McCann to a pervasive and hostile work environment, which included screaming late-night threats to "take [her] down and everything around [her]," hurling gender-based insults such as calling her a "nasty woman," and weaponizing her private medical history.

6.      This lawsuit brings claims for breach of fiduciary duty under the entire fairness standard, corporate waste, breach of contract, economic duress, defamation per se, invasion of privacy, gender discrimination, retaliation, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). Plaintiff seeks comprehensive declaratory and equitable relief, including the rescission of the bad-faith equity dilution, as well as compensatory damages, treble damages, and punitive damages to rectify Defendants' egregious and intentional wrongdoing.

## THE PARTIES

7.      Plaintiff Kristy McCann is a natural person and a citizen of the State of Florida. She is the visionary founder and former Chief Executive Officer of SkillCycle, Inc., having built the Company to nearly $29 million in valuation before Defendants initiated their hostile takeover.

8.      Defendant BIP Ventures, L.P. is a venture capital firm with its principal place of business located at 3575 Piedmont Rd NE, Atlanta, Georgia. Through its "Opportunity Fund," BIP Ventures invested in SkillCycle, Inc. and exercised actual control over the Company as a controlling shareholder.

9.      Defendant BIP Ventures Management, LLC is the management entity for BIP Ventures, also operating out of Atlanta, Georgia, and was actively involved in directing the unlawful operational and financial schemes alleged herein.

10.     Defendant Mark Buffington is a principal and representative of BIP Ventures. At all relevant times, Mr. Buffington acted as a controlling investor and board advisor for SkillCycle, Inc., directly orchestrating the hostile board coup, the predatory dilution of Plaintiff's equity, and the defamatory and discriminatory conduct giving rise to this action.

11.     Defendant SkillCycle, Inc. (the "Company") is a privately held C-Corporation incorporated under the laws of the State of Delaware. While incorporated in Delaware, the Company maintained an office at 26 Broadway, New York, New York, and its operations, employment activities, and the events giving rise to this litigation were substantially conducted in and directed at New York. (Defendant BIP Ventures, L.P., Defendant BIP Ventures Management, LLC, Defendant Mark Buffington and Defendant SkillyCycle, Inc. are sometimes hereinafter collectively referred to as "Defendants").

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) because Plaintiff asserts claims arising under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

13.     This Court also possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) (Diversity Jurisdiction) because there is complete diversity of citizenship between Plaintiff, a citizen of Florida, and Defendants, who are citizens of Delaware and Georgia, and the amount in controversy significantly exceeds $75,000, exclusive of interest and costs.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims, including breach of fiduciary duty, breach of contract, economic duress, invasion of privacy, and defamation per se, pursuant to 28 U.S.C. § 1367, as these claims are so closely related to the federal claims that they form part of the same case or controversy arising from a common nucleus of operative facts. While Plaintiff's corporate governance claims are governed by Delaware substantive law pursuant to the internal affairs doctrine, federal courts routinely exercise jurisdiction to apply Delaware law to such claims.

15.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. SkillCycle, Inc. actively operated in New York, Plaintiff's employment relationship was centered in New York, and the Defendants exercised control, directed operational decisions, and communicated defamatory statements that directly impacted operations and individuals within this District.

16. Venue is additionally proper under the RICO venue statute, 18 U.S.C. § 1965, because the corporate and individual Defendants transact their affairs in this District, having conducted business activities and directed the hostile takeover of a New York-operating enterprise. Furthermore, the corporate Defendants are deemed to reside in this District for venue purposes under 28 U.S.C. § 1391(c) and (d) because their contacts with New York are sufficient to subject them to personal jurisdiction in this State.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. Introduction

17. Plaintiff Kristy McCann is the visionary founder and former Chief Executive Officer of SkillCycle, Inc. (the "Company"), a Delaware C-Corporation.

18. Founded by Ms. McCann, SkillCycle was built to democratize professional development by providing a unified platform for upskilling and coaching.

19. Under Ms. McCann's leadership and vision, SkillCycle achieved significant growth, attaining a valuation of nearly $29 million in 2023 and reaching $2.7 million in Annual Recurring Revenue ("ARR") by July 2025, placing the Company on a clear path to hit $3 million in ARR.

20. However, this upward trajectory was derailed when BIP engaged in forced "pay-to-play" financing tactics and deliberately withheld board-approved investment tranches. These oppressive actions intentionally depressed the Company's value, resulting in down-round valuations, forced employee layoffs, and stunted growth. Consequently, SkillCycle was forced to constantly operate in survival mode, systematically depleting the equity of Ms. McCann and other investors.

21.    Defendant BIP Ventures ("BIP") entered the Company as an investor through its "Opportunity Fund," a $300 million fund ostensibly marketed to support and invest in diverse founders like Ms. McCann.

## II.    The Systemic Rico "Playbook" and Shareholder Oppression

22.    BIP's conduct toward SkillCycle is not an isolated corporate dispute, but rather part of a broader, systemic pattern of racketeering activity and shareholder oppression.

23.    BIP has deployed an identical "playbook" of extortion and corporate manipulation against numerous other portfolio companies, including ChargeZoom, FinQuery, and AchieveIt.

24.    In the case of ChargeZoom, BIP falsely accused the founder of fraud. After an independent auditor confirmed no fraud had occurred, ChargeZoom's other investors confronted Mark Buffington regarding his fabricated accusations. Consequently, BIP was forced to surrender its equity and exit the company, recovering only the exact principal amount it had initially contributed, and released the company from BIP's oppressive pro-rata and drag-along rights, allowing ChargeZoom to escape BIP's suppression tactics and resume a trajectory of high growth.

25.    Similarly, BIP manipulated FinQuery into taking investment from its Opportunity Fund to preempt a friends-and-family financing round. Despite holding only a minority stake, BIP dictated terms affording it majority control, consistently clashed with FinQuery's leadership, and disrupted subsequent funding rounds by solely prioritizing its own interests over those of the company and its other investors.

26.    The suppression of AchieveIt demonstrates BIP's willingness to use extreme coercion to strip assets from founders. AchieveIt has languished under BIP's control for a decade, during which BIP has consistently blocked outside investment while providing only "starvation tranches" of capital to maintain control and collect management fees.

27.     Mark Buffington and BIP partner Christy Johnson personally recounted to Ms. McCann how they ousted AchieveIt's original CEO by fabricating heinous, anonymous allegations against him. Mr. Buffington boasted about leveraging his attorneys to threaten the founder with jail time unless he stepped down and forfeited control. Ms. McCann understood this highly inappropriate story to be an explicit threat regarding the lengths BIP's counsel would go to destroy founders who defied them.

28.     Following this orchestrated ouster, BIP installed its own partner, Christy Johnson, to run AchieveIt, resulting in years of stagnation. A subsequent CEO was terminated by BIP within a year, and the company is now run by another co-founder who has spent years attempting to extricate the business from BIP's control.

29.     Further evidencing this systemic asset-stripping scheme, BIP's own SEC filings reveal an irregular fund structure designed to perpetually extract management fees. Rather than operating standard early-stage growth funds, BIP creates dedicated, company-specific funds for the portfolio entities it traps, such as "BIP Capital AchieveIt Series D, LLC," "Panoramic ShiftMed Equity I, LLC," and "Panoramic Mediafly Equity I, LLC".

30.     Upon information and belief, this abnormal structure, along with the use of the BIP Ventures Evergreen BDC, is utilized to circumvent standard Investment Company Act of 1940 requirements while keeping captive portfolio companies in a state of perpetual fee generation. It appears from public SEC 8-K filings that the BIP Ventures Evergreen BDC has had no new portfolio wins or exits in 2026, relying instead on nominal distributions and Other Events filings. This strongly corroborates the civil RICO narrative that BIP is operating a pyramid scheme, relying on predatory "loan-to-own" tactics to strip assets from captive companies like SkillCycle to cover liabilities within their broader wealth management structure.

31.     This systemic playbook involves utilizing false accusations of fraud, withholding critical funding tranches, and weaponizing Right of First Refusal ("ROFR") and pro rata provisions to block third-party investments and trap founders.

32.     During the Series A financing in 2024 and 2025, Ms. McCann attempted to extricate the Company from BIP's control by securing investment from outside third parties. In response, BIP weaponized its pro rata and ROFR rights to explicitly block these outside investments, denying the Company access to alternative capital.

33.     By deliberately blocking outside investors and continually altering deal terms and budgets in the final hours of negotiations, BIP intentionally starved the Company of cash. The manufactured financial distress was so severe that Ms. McCann was forced to personally incur $200,000 in credit card debt on her personal American Express card simply to keep the Company afloat.

34.     BIP's new point of contact, John Wu, is actively holding sale conversations with HR tech companies PerformYard and Leapsome, in addition to KKR, seeking a rapid sale at a 6x ARR valuation. However, under BIP's disastrous usurpation of control, the Company's Annual Recurring Revenue (ARR) has plummeted to $2.4 million, representing a drop of $300,000 since July 2025. Even at this artificially depressed valuation, Plaintiff's initial $500,000 foundational investment would have been worth $3 million today had Defendants not executed their predatory, bad faith equity dilution.

35.     These forced "pay-to-play" rounds severely diluted and harmed the equity of Ms. McCann and other early SkillCycle investors.

36.     Upon information and belief, BIP has recently consolidated its venture and wealth management arms. This structure demonstrates a broader enterprise motivation to systematically

strip assets from captive portfolio companies to service liabilities within BIP's wealth management division. This motive is further evidenced by the fact that BIP Wealth publicly announced two acquisitions of small southern wealth management groups over the last six months. This aggressive expansion perfectly corroborates the narrative that BIP is intentionally squeezing captive portfolio companies like SkillCycle to fund the liabilities and acquisitions within its broader wealth management operations.

37.    Other extortionate conduct includes coercing Plaintiff into signing an oppressive separation agreement and forfeiting her equity by explicitly threatening her with fabricated, false criminal and civil fraud allegations. In addition, Defendants' extortionate tactics may have escalated to physical intimidation. For the past month prior to the date of this Complaint, a suspicious gray truck with tinted windows has been parked in Plaintiff's neighborhood. Retired police officers have explicitly alerted Plaintiff to this surveillance, causing her to reasonably fear that BIP is utilizing intimidation and stalking tactics to force her to drop this litigation.

### III.    Predatory Dilution, Contact Alterations, and the July 2025 Threat

38.    In an effort to squeeze Ms. McCann out of her own company, BIP engaged in further predatory financing tactics, repeatedly withholding board-approved capital to intentionally depress the Company's value.

39.    By forcing subsequent "pay-to-play" rounds, BIP successfully diluted Ms. McCann's ownership in SkillCycle from approximately 80 percent down to roughly 4 percent. This ultimate reduction to 4 percent will formalize after March 27, 2026, as a direct consequence of her retaliatory termination. Furthermore, the severe financial hardship intentionally inflicted upon Ms. McCann by BIP's oppressive scheme has made it impossible for her to exercise her remaining unvested options, thereby completing the bad-faith stripping of her equity.

40.     Furthermore, BIP unilaterally and improperly altered material terms of the Series A financing after signatures had already been collected from the parties, a breach evidenced by a chain of 66 emails documenting the post-signature changes.

41.     In mid-July 2025, when Ms. McCann refused to capitulate to these oppressive tactics, BIP representative Mark Buffington explicitly threatened her, stating verbatim that if she did not step down from her own company, he would "take [her] down and everything around [her]". This harassment went far beyond the workplace; Mr. Buffington routinely called Ms. McCann late at night, drinking whiskey, and aggressively screaming insults at her.

42.     Mr. Buffington routinely exhibited highly unprofessional and insidious behavior toward Ms. McCann, which included placing his daughter, a junior at Notre Dame, on speakerphone to provide "feedback" on the Company's private operations while he was driving to his lake house.

## IV.     The Board and The Board Coup and Retaliatory Termination

43.     On November 6, 2025, SkillCycle board member Jason Finney formally requested an independent governance and financial audit of the Company due to BIP's overreach.

44.     In direct retaliation to this request, less than one week later on November 11, 2025, BIP executed a hostile board coup.

45.     To bypass class-voting protections, BIP converted over four million preferred shares to common stock, an amount drastically exceeding what was necessary, solely to subvert corporate democracy, seize control of the board, and forcibly remove Ms. McCann.

46.     As a fabricated pretext for her termination, BIP weaponized Ms. McCann's LinkedIn post celebrating SkillCycle's inclusion on the Inc. 5000 list, falsely claiming it drove

investors away. In reality, investors liked and shared the post, proving this was merely an excuse for termination.

47.     Furthermore, during a recorded September 19, 2025 board meeting, Mark Buffington berated Ms. McCann, stating she was "not KKR material" and that KKR would never invest in a CEO like her. Ironically, BIP's new point of contact, John Wu, is now actively leading the charge to quickly sell the Company at a 6x ARR valuation, and this potential sale is being actively pitched to KKR and Insight Partners. The fact that KKR has recently reached out to the new leadership to discuss this acquisition highlights that Mr. Buffington's attacks were nothing more than baseless character assassination used as a pretext for his hostile takeover.

## V.     Post-Termination Misconduct, Corporate Waste, and Defamation

48.     Immediately following the retaliatory termination of Ms. McCann, the BIP-controlled board installed a "loyalist" interim CEO, Matt Pietsch.

49.     Despite having materially less experience than Ms. McCann, Mr. Pietsch was granted a salary of $280,000 plus 8 percent equity, a compensation package more than 60 percent higher than Ms. McCann's, constituting a gross waste of corporate assets.

50.     Mr. Pietsch's tenure was a failure, and he was fired in less than 90 days. Despite his staggering incompetence, which included a disastrous day-one plan to replace human coaches with automated "bots", Mr. Pietsch was still awarded two months of severance pay. The Company is now being run by Jason Finney and a junior sales account executive, Andrew Hibschman.

51.     The ongoing waste of corporate assets under BIP's control is staggering. While the Company simultaneously conducts severe employee layoffs, Jason Finney and Andrew Hibschman are aligning with BIP to pad their own pockets. Despite being a junior account executive, Mr. Hibschman is receiving a grossly inflated $185,000 base salary, pushing his total

11

targeted compensation to approximately $300,000, while Mr. Finney is receiving a raise from his $215,000 salary. It appears that Mr. Hibschman pushed for a higher base salary specifically because his commissions are light due to the Company's declining performance.

52.    BIP's shadow control over the Company also extends to its improper manipulation of SkillCycle's Directors & Officers (D&O) insurance policy through Berkley Regional Insurance Company. While Ms. McCann was improperly removed from the D&O policy post-termination, BIP is actively attempting to use the Berkley Regional Insurance policy to indemnify their newly installed loyalists, including Matt Pietsch, Jason Finney, Ted Brodheim, and Michele Bresnick. Furthermore, Mark Buffington was technically only a board advisor and not a covered standard officer, yet he is attempting to utilize the corporate policy to shield his personal misconduct.

53.    This improper manipulation and obstruction of the corporate insurance policy is ongoing. The insurance carrier recently issued a final report regarding coverage, yet BIP is actively hiding this critical document from both the Company's current leadership, including Jason Finney, and the Company Controller. In fact, BIP has entirely blocked Mr. Finney from communicating with the insurance company after he attempted to discuss the policies, further demonstrating BIP's bad faith effort to hijack the corporate policy to conceal their misconduct and shield themselves from personal liability.

54.    Furthermore, BIP is actively suppressing standard corporate governance to conceal its misconduct. Formal requests by the CEO for an independent financial audit and the appointment of an independent board member have been entirely ignored. To evade scrutiny and avoid generating official corporate records, BIP now deliberately circumvents standard board protocols, opting instead to conduct Company business exclusively through "special meetings". This tactic

is a calculated effort to keep their bad-faith machinations off the official board minutes and obscure the reality of their operations from the corporate record.

55.     Due to BIP's constant operational meddling and usurpation of control throughout 2025, SkillCycle significantly missed its year-end financial goals. As a direct result, the Company is once again operating in severe "survival mode," lacking the necessary budget to backfill critical roles. Despite a recent $1 million cash injection from BIP intended to merely keep the Company afloat, SkillCycle currently possesses barely six months of financial runway.

56.     Furthermore, BIP has fostered a pervasive and hostile work environment and repeatedly protected its own abusive representatives. In 2023, Company co-founder Rebecca Taylor was subjected to sexual harassment by BIP representative Dan Dreschel. In response to this misconduct, Ms. McCann removed Mr. Dreschel from the Company's board of directors and formally notified BIP of his actions and the reasons for his removal. Despite this explicit notification, and upon information and belief, despite his track record of failure at other portfolio companies, BIP refused to terminate Mr. Dreschel or hold him accountable.

57.     To further maintain control and a culture of fear, BIP representatives have even made inappropriate comments regarding the legal immigration status of Company Controller Andres Guevara, who is operating on a green card. By weaponizing the visa status of an immigrant, Defendants are attempting to ensure compliance and retaliate against those who might expose their misconduct.

58.     This exodus of key talent, coupled with constant customer churn, a deliberate starvation of resources, and the absence of any coherent strategic vision or roadmap under BIP's control, has effectively destroyed the Company's ability to raise a Series B financing round due to a total lack of traction. Upon information and belief, BIP's ultimate endgame is to either orchestrate

a fire-sale acquisition of the Company for little to no value or to intentionally warehouse it, mirroring its bad-faith suppression of AchieveIt, solely to continue extracting management fees and to indefinitely delay returning capital to its Limited Partners.

59.     In late December 2025, BIP directed Mr. Pietsch to secretly access Ms. McCann's previously deleted Company email account. This unauthorized "fishing expedition" was expressly designed to search for "compromising" material to manufacture retroactive leverage and justify a "for cause" termination.

60.     To further damage Ms. McCann, BIP and Mr. Buffington have published materially false statements and narratives to outside investors and employees, claiming Ms. McCann committed "fraud" and misrepresented the Company's financial status. Upon information and belief, BIP and Mr. Buffington also weaponized Ms. McCann's private medical information and personal tragedies to falsely claim she was unfit to lead the Company. Specifically, they improperly discussed her bipolar diagnosis and recent surgical history with board members to intentionally undermine her credibility. Demonstrating a severe lack of basic decency and further evidencing their bad-faith, oppressive conduct, BIP effectuated Ms. McCann's retaliatory termination just three days after she underwent her second major surgery of 2025, during a period when she was also grieving the recent death of her father.

61.     As a direct act of retaliation and economic duress for refusing to sign their oppressive severance agreement, SkillCycle and BIP have actively blocked Ms. McCann from receiving her Florida unemployment benefits.

62.     Furthermore, the separation agreement BIP attempted to force upon Ms. McCann required her to release Mark Buffington personally and indemnify "BIP Wealth Management," an entirely unrelated entity. By contrast, the separation agreements for Jeff Reid and recently

terminated employee Brett Frank only required a standard release of "the Company". This stark comparison proves disparate treatment and exposes BIP's desperate attempt to use corporate funds to shield Buffington and BIP's broader wealth management arm from personal liability.

63.     These defamatory accusations of fraud are entirely baseless and have been explicitly refuted by the Company's own Controller, as well as by independent members of the Board of Directors and other outside investors in SkillCycle.

64.     BIP has placed the Company on a total lockdown, operating through a culture of fear and expressly threatening employees and investors to strictly forbid them from communicating with Ms. McCann. Because BIP has failed to provide any formal communication or strategic roadmap regarding her departure, Ms. McCann continues to receive inquiries from confused coaches, team members, customers, and interested outside investors.

65.     Under BIP's usurpation of control, SkillCycle has effectively been reduced to a stagnant "zombie company". In the six months following Ms. McCann's retaliatory removal, the Company has experienced little to no growth, and its Annual Recurring Revenue has plummeted to $2.4 million, a staggering $300,000 drop since July 2025. Furthermore, despite Mr. Buffington's representations that BIP would install a "high caliber" human capital management leader, BIP instead installed Matt Pietsch, an unqualified loyalist whose recent experience consisted of working as a sales agent at a travel agency. As a direct result of this staggering incompetence and a complete lack of trust in BIP, Ms. Taylor was ultimately forced to leave the Company following Ms. McCann's ouster.

66.     BIP's recent $1 million cash injection into the Company was strategically structured as a convertible note. Upon information and belief, BIP deliberately utilized this debt structure to

15

ensure it receives priority payout in any liquidation or M&A transaction, intentionally subordinating the interests of common shareholders to protect its own downside.

67.    Moreover, BIP's bad-faith operations and the resulting legal liabilities surrounding Ms. McCann's retaliatory termination have effectively destroyed the Company's marketability, taking a legitimate sale of the business completely off the table. Upon information and belief, outside investors have confirmed BIP's scheme, and BIP's reputation as a predatory asset management "shark", rather than a legitimate venture capital firm, is widely recognized within the industry. As a direct result of this systemic scheme, reputable outside investors refuse to participate in deals involving BIP, permanently cutting off SkillCycle's access to vital future funding.

68.    Upon information and belief, BIP is currently committing further abuses by attempting to manipulate SkillCycle's Directors & Officers (D&O) insurance policy, issued through Berkley Regional Insurance Company, to improperly indemnify BIP loyalists and shield themselves from liability for their bad-faith conduct.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty by Controlling Shareholder**
**(Against BIP Ventures, L.P., BIP Ventures**
**Management, LLC, and Mark Buffington)**

69.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

70.    Plaintiff Kristy McCann brings this claim for breach of fiduciary duty against BIP Ventures, L.P., BIP Ventures Management, LLC, and Mark Buffington (collectively, "BIP Defendants") based on their exercise of actual control over SkillCycle, Inc. and their self-dealing transactions that diluted Plaintiff's equity from approximately 80% to 7% for the benefit of preferred stockholders at the direct expense of common shareholders.

71.       This claim is governed by Delaware law under the internal affairs doctrine. Under Delaware law, equity dilution claims involving self-dealing by a controlling shareholder must be brought derivatively, as the harm to minority shareholders is not independent of the harm to the corporation, because the injury arises from the corporation's issuance of shares for inadequate consideration which diminishes the corporation's net worth. *See Brookfield Asset Mgmt. v. Rosson*, 261 A.3d 1251 (Del. 2021). Because the BIP Defendants utilized their actual control to force "pay to play" rounds and convert preferred shares to capture the Company's value and subvert the stockholder franchise, Plaintiff has derivative standing to bring this claim on behalf of the Company for the severe and predatory dilution of her foundational equity.

72.       BIP Defendants qualify as a controlling shareholder subject to fiduciary duties under Delaware law based on their actual control over specific corporate transactions, not merely their ownership percentage. Under Delaware law, a minority blockholder triggers fiduciary duties to the corporation and minority stockholders if they exercise actual control over the deciding committee with respect to the challenged transaction. *See In re Oracle Corp. Derivative Litig.*, 339 A.3d 1 (Del. 2025); *Ban v. Manheim*, 339 A.3d 41 (Del. Ch. 2025).

73.       BIP Defendants exercised actual control over SkillCycle through multiple operational decisions, including directing the interim CEO to access and search Ms. McCann's deleted emails for compromising material, which was a secretive instruction designed to manufacture post hoc justification for her removal. Officers and agents owe a duty to act for proper corporate purposes, not to prioritize the self-interest of a superior or controlling stakeholder. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022).

74.       BIP Defendants further exercised actual control by orchestrating the board coup on November 11, 2025, converting over four million preferred shares to common stock solely to seize

17

board control and forcibly remove Ms. McCann, and by withholding board-approved capital to force dilution. Delaware courts have repeatedly held that inequitable manipulation of voting rights and corporate machinery is impermissible even if technically authorized.

75.     When a controlling shareholder engages in a self-dealing transaction without approval by the company's independent board, the transaction constitutes a breach of the shareholder's fiduciary duties unless it satisfies Delaware's entire fairness standard. The defendants bear the burden of proving that the transaction with the controlling shareholder was entirely fair to the minority stockholders. *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

76.     BIP stood on both sides of the equity dilution transaction by simultaneously acting as controlling investor and beneficiary of the dilution, which benefited preferred stockholders at the direct expense of common shareholders. This constitutes classic self-dealing that triggers entire fairness review. *See Stegemeier v. Magness*, 728 A.2d 557 (Del. 1999). Because the BIP Defendants utilized their position of control to extract a benefit from the dilution entirely to the exclusion of Plaintiff, the transaction is patently unfair and fails the entire fairness test.

77.     Under Delaware law, which applies when a controlling shareholder prioritizes preferred stock interests over common shareholders through mechanisms such as withholding capital to force dilution, BIP's conduct falls outside the protection of the business judgment rule.

78.     BIP Defendants must prove both fair dealing and fair price, a burden they cannot meet given the evident conflicts of interest and a stark lack of independent process. Specifically, counsel for BIP Ventures and the Company appears on the Company's capitalization table through "Service Provider Capital," creating a fundamental conflict of interest where the very counsel advising on the fairness of these transactions holds a financial stake in the outcome. Entire fairness

is the applicable standard where the board or its advisors labor under actual conflicts of interest. *See GB-SP Holdings, LLC v. Walker*, 2024 WL 4799490 (Del. Ch. Nov. 15, 2024).

79.    The business judgment rule is entirely inapplicable because BIP Defendants acted in bad faith, for an improper purpose, and without a functioning, independent special committee. *See Teuza-A Fairchild Tech. Venture, Ltd. v. Lindon*, 2023 Del. Ch. LEXIS 94 (Apr. 27, 2023). This bad faith is demonstrated by:

- The secretive email search instruction constituting a fishing expedition to manufacture evidence.
- The false fraud accusations explicitly contradicted by the Company's own Controller.
- The "Service Provider Capital" conflict tainting the process.
- The retaliatory motive evidenced by the temporal proximity between the November 6 governance audit request and the November 11 termination.

80.    Under the *Tooley* framework, Plaintiff properly brings this claim derivatively on behalf of the Company, because the injury arises from the corporation's issuance of shares for inadequate consideration, which diminished the corporation's net worth. *See Brookfield Asset Mgmt. v. Rosson*, 261 A.3d 1251 (Del. 2021).

81.    As a direct and proximate result of BIP's self-dealing conduct, Plaintiff suffered direct economic injury through the predatory dilution of her equity from approximately 80% to 7%.

82.    Plaintiff is entitled to broad equitable and monetary remedies, including rescission of the equity dilution transactions, restoration of her equity position prior to the dilution, injunctive relief preventing the use of improperly obtained information, compensatory damages, and punitive damages for egregious and intentional wrongdoing.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Breach of Contract – Invalid Modification**
**(Against BIP Ventures, L.P. and BIP Ventures Management, LLC)**

83.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

84.    Plaintiff and Defendants entered into valid and binding contractual agreements regarding the Series A financing of SkillCycle, Inc.

85.    Under Delaware law, when a contract expressly requires modifications to be in writing and signed by the parties, any purported unwritten or oral modification is strongly disfavored and can only be enforced if proven by the high burden of clear and convincing evidence. See Eureka VIII LLC v. Niagara Falls Holdings LLC, 899 A.2d 95, 109 (Del. Ch. 2006). Because Plaintiff never signed or consented to the material alterations the BIP Defendants fraudulently inserted after signatures were collected, the purported modifications are invalid and the parties' rights remain governed by the original agreement.

86.    Following the collection of signatures from the parties, BIP unilaterally and improperly altered material terms of the Series A financing.

87.    These post-signature alterations are irrefutably evidenced by a chain of 66 emails documenting the changes made by BIP without obtaining the required mutual assent from Plaintiff and other affected parties.

88.    By unilaterally altering these material terms, BIP breached the original, mutually agreed-upon terms of the Series A investment.

89.    As a direct and proximate result of BIP's breach of contract, Plaintiff suffered substantial economic damages, including the severe and bad-faith dilution of her equity and the manufactured financial distress of the Company.

## AS AND FOR A THIRD CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against All BIP Defendants)**

90.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

91.     Delaware law recognizes an implied covenant of good faith and fair dealing in every contract, requiring that parties refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party from receiving the fruits of the bargain. See Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC, 112 A.3d 878 (Del. 2015).

92.     The implied covenant applies directly to the relationship between controlling shareholders and minority shareholders, obligating controlling investors not to abuse their position to pursue personal vendettas or manufacture evidence against founders and executives.

93.     BIP Defendants breached the implied covenant of good faith and fair dealing through a calculated pattern of arbitrary and unreasonable conduct, including:

- Unilaterally making post-signature alterations to material Series A investment terms.
- Repeatedly withholding board-approved capital tranches to intentionally starve the Company of cash, thereby forcing "pay-to-play" rounds and predatory dilution.
- Directing the interim CEO to conduct a secretive, unauthorized search of Plaintiff's previously deleted emails specifically to find "compromising" material, in a bad-faith effort to manufacture retroactive leverage.
- Threatening Plaintiff with false and fabricated fraud allegations to improperly coerce her into signing an oppressive separation agreement.

94.     BIP's conduct frustrated Plaintiff's reasonable expectations under the Series A investment agreement and her employment arrangements, demonstrating a complete absence of good faith.

95.     As a direct result of this breach, Plaintiff suffered severe financial harm, loss of her equity position, and the deprivation of the benefits she reasonably expected from her foundational agreements with the Company and its investors.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Economic Duress
**(Against SkillCycle, Inc., BIP Ventures, L.P., and Mark Buffington)**

96.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

97.     Under Delaware law, a contract or release may be voidable if obtained through economic duress, which requires three elements: (1) a wrongful act, (2) which overcomes the will of the aggrieved party, and (3) leaves the victim with no adequate legal remedy or reasonable alternative to accepting the bargain. Furthermore, the wrongful act must be of such a nature as to actually over-ride the judgment and will of the other party to constitute improper coercion. See Cianci v. JEM Enters., Inc., 2000 Del. Ch. LEXIS 125 (Del. Ch. Aug. 22, 2000) (noting that economic duress requires a wrongful act that actually over-rides the judgment and will of the aggrieved party, who has no reasonable alternative to accepting the bargain).

98.     Following the retaliatory board coup, Defendants attempted to force Plaintiff to sign a highly restrictive separation agreement that demanded she personally release Mark Buffington and indemnify "BIP Wealth Management," an entirely unrelated entity.

99.     To coerce Plaintiff into signing this oppressive release, Defendants explicitly threatened her with a "for cause" termination based on completely fabricated allegations of fraud and financial misrepresentation.

100.     These fraud allegations were known by Defendants to be false and were explicitly refuted by the Company's own Controller, demonstrating that the threat was a coercive act of bad faith rather than a legitimate corporate action.

101.    When Plaintiff refused to capitulate to these extortionate threats and sign the release, Defendants executed the retaliatory termination and actively blocked her from receiving her legally entitled unemployment benefits to inflict maximum financial distress.

102.    Defendants' weaponization of false criminal/fraud accusations to extract a civil release constitutes improper coercion and economic duress under Delaware law, entitling Plaintiff to damages and rendering any purported "for cause" justifications for her termination entirely void.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Defamation Per Se**
**(Against BIP Ventures, L.P., BIP Ventures**
**Management, LLC, and Mark Buffington)**

103.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

104.    Under Delaware law, defamation per se includes statements that malign a person in their trade, business, or profession, or impute the commission of a crime. See Re Reardon, 759 A.2d 568, 575 (Del. 2000). Under Delaware law, a statement constitutes defamation per se if it imputes a crime, a loathsome disease, affects the plaintiff in their business, trade, profession, or office, or imputes unchastity. See McMahon v. McMahon, 340 A.3d 543 (2025); Laser Tone Bus. Sys., LLC v. Del. Micro-Computer LLC, 2019 Del. Ch. LEXIS 1393 (2019); Thompson v. Robbins, 2015 Del. Super. LEXIS 1044 (2015).

105.    Following the retaliatory termination of Plaintiff, Defendants BIP Ventures and Mark Buffington published materially false statements to outside investors, employees, and business partners, explicitly claiming that Plaintiff was terminated for committing "fraud" and "misrepresenting financial status".

106.    These defamatory accusations directly impute criminal conduct and severely malign Plaintiff's professional competence and standing in her trade as a corporate executive.

23

107.    Defendants knew these statements were demonstrably false at the time they were published. The fraud allegations were entirely baseless and were explicitly refuted by the Company's own Controller. By publishing these statements despite knowing they were false, Defendants acted with actual malice and a deliberate intent to destroy Plaintiff's professional reputation.

108.    Because these defamatory statements impute a crime and malign Plaintiff in her profession, they constitute defamation per se. Accordingly, the law presumes damages, and Plaintiff is not required to prove special pecuniary loss to recover.

109.    This malicious and defamatory conduct exposes Mark Buffington to personal liability entirely distinct from the corporate entity.

110.    As a direct and proximate result of Defendants' defamatory statements, Plaintiff has suffered immense reputational harm and professional damage.

111.    Furthermore, due to the deliberate, egregious, and intentional nature of Defendants' fabricated fraud accusations, Plaintiff is entitled to an award of punitive damages under Delaware law.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Gender Discrimination and Hostile Work Environment
### (Against SkillCycle, Inc., BIP Ventures, L.P., BIP Ventures Management, LLC, and Mark Buffington)

112.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

113.    The Delaware Discrimination in Employment Act (DDEA) and Title VII of the Civil Rights Act of 1964 prohibit discrimination against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's sex. Delaware courts apply the McDonnell Douglas burden-shifting framework to evaluate workplace

24

discrimination claims, requiring a plaintiff to show: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination. See Riner v. Nat'l Cash Register Corp., 434 A.2d 375, 376 (Del. 1981); See Riner v. Nat'l Cash Register Corp., 434 A.2d 375, 376 (Del. 1981); Makky v. Chertoff, 541 F.3d 205 (3d Cir. 2008).

114.    Plaintiff is a female and was exceptionally qualified for her position as Founder and Chief Executive Officer, having built the Company to $2.7 million in Annual Recurring Revenue.

115.    Defendants engaged in blatant disparate treatment by terminating Plaintiff and replacing her with an unqualified male interim CEO, Matt Pietsch, who received a $280,000 salary and 8% equity, compensation that was more than 60% higher than Plaintiff's own pay and equity, despite his vastly inferior experience.

116.    Furthermore, Plaintiff was subjected to a hostile work environment that was sufficiently severe or pervasive to alter the conditions of her employment. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). Defendant Mark Buffington routinely directed gender-based animus toward Plaintiff, including aggressively screaming at her and explicitly referring to her as a "nasty woman". Defendants further weaponized Plaintiff's private medical information by improperly discussing her hysterectomy, gallbladder removal, and bipolar diagnosis with board members to intentionally undermine her credibility as a female executive.

117.    This gender-based hostility is systemic within the enterprise. The Board previously had to remove BIP representative Dan Dreschel for sexually harassing conduct, and current long-tenured employees have expressed fear of termination should they object to Mr. Buffington's insidious behavior toward women.

25

118.     As a direct and proximate result of this discriminatory conduct and hostile work environment, Plaintiff suffered severe economic damages, including lost back pay, front pay, and the loss of her equity, as well as immense emotional distress. Given the egregious and intentional nature of this sex-based hostility, Plaintiff is entitled to punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
**Retaliation**
**(Against SkillCycle, Inc., BIP Ventures, L.P., BIP Ventures**
**Management, LLC, and Mark Buffington)**

119.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

120.     Under the DDEA and Title VII, an employer may not retaliate against an employee for opposing unlawful practices or engaging in protected activities. To establish a claim for retaliation under Delaware law, a plaintiff must demonstrate: (1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action. See Rizzitiello v. McDonald's Corp., 868 A.2d 825, 830 (Del. 2005); Bateman v. State, 2020 WL 5890571 (Del. Super. Ct. Oct. 5, 2020).

121.     Plaintiff engaged in protected activity by continually opposing Defendants' oppressive conduct, and this opposition culminated on November 6, 2025, when independent board member Jason Finney formally requested a governance and financial audit of the Company to scrutinize BIP's overreach.

122.     In direct retaliation for this protected activity, Defendants executed a hostile board coup and terminated Plaintiff.

123.     The causal connection is irrefutably established by the extremely close temporal proximity: Plaintiff was subjected to the adverse employment action of retaliatory termination on November 11, 2025, a mere five days after the formal governance audit request was made.

26

Delaware courts recognize that such close temporal proximity between protected activity and an adverse action provides direct evidence of a retaliatory motive.

124.     As a direct and proximate result of Defendants' retaliatory termination, Plaintiff has suffered significant economic harm, loss of her foundational equity, professional damage, and severe emotional distress. Plaintiff is entitled to back pay, front pay, compensatory damages, punitive damages, and attorneys' fees.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Invasion of Privacy**
**(Against BIP Ventures, L.P., BIP Ventures**
**Management, LLC, Mark Buffington, and SkillCycle, Inc.)**

125.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

126.     Under Delaware law, a former executive may possess a reasonable expectation of privacy in their personal information post-termination if the circumstances, such as the absence of monitoring, compliance with statutory protections, and deliberate actions to protect sensitive data, support such an expectation. The deliberate actions of the account holder could be relevant in determining whether a reasonable expectation of privacy persists post-termination. See Twitter, Inc. v. Musk, 2022 Del. Ch. LEXIS 227.; Dlo Enters. v. Innovative Chem. Prods. Grp., LLC, 2020 Del. Ch. LEXIS 202.

127.     Following Plaintiff's retaliatory termination, the Company's Controller intentionally deleted Plaintiff's email archive specifically to protect her personal and sensitive information, which included her Social Security Number and banking details. This action established a clear and reasonable expectation of privacy regarding the contents of that deleted account.

128. In late December 2025, Defendants BIP Ventures and Mark Buffington directed interim CEO Matt Pietsch to circumvent these privacy protections by acquiring Google Administrator rights to specifically reactivate and search Plaintiff's previously deleted email account.

129. This unauthorized search was entirely devoid of any legitimate corporate purpose, as any valid business need to access Plaintiff's emails extinguished upon her termination. Instead, this was a secretive, bad-faith fishing expedition explicitly ordered to find "compromising" material. The express purpose of this intrusion was to manufacture retroactive leverage against Plaintiff to justify a fabricated "for cause" termination and coerce her into signing an oppressive separation agreement.

130. Defendants' deliberate and unauthorized reactivation and search of Plaintiff's deleted email account constitutes an intentional, highly offensive, and unlawful intrusion upon her reasonable expectation of privacy.

131. As a direct and proximate result of Defendants' invasion of privacy, Plaintiff has suffered damages, including the violation of her privacy rights and the potential weaponization of her personal information.

132. Furthermore, because this unauthorized search was conducted post-termination, in bad faith, and with the malicious intent to manufacture leverage, Defendants' misconduct is egregious and intentional, thereby entitling Plaintiff to an award of punitive damages under Delaware law.

28

**AS AND FOR A NINTH CAUSE OF ACTION**
**Violations of the Delaware Racketeer Influenced and**
**Corrupt Organizations (RICO) Act, 11 Del. C. § 1501 et seq.**
**(Against All BIP Defendants)**

133.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

134.    Delaware's RICO statute makes it unlawful for any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. See 11 Del. C. § 1503(a).

135.    The explicit purpose of the Delaware RICO statute extends beyond traditional organized crime and is intended to guard against and prevent the infiltration and illegal acquisition of legitimate economic enterprises by racketeering practices. See 11 Del. C. § 1501.

136.    Defendants BIP Ventures, BIP Ventures Management, LLC, Mark Buffington, and their associated legal and operational agents constitute an "enterprise" within the meaning of the statute.

137.    Defendants conducted the affairs of this enterprise through a pattern of racketeering activity, which requires two or more incidents of conduct that constitute racketeering activity. See Kendall v. State, 726 A.2d 1191 (Del. 1999). A plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. See Simms-Malone v. State, 676 A.2d 907 (Del. 1996).

138.    This continuity requirement is firmly established because Defendants' predicate acts are part of the enterprise's regular way of doing business. See Kendall v. State, 726 A.2d 1191 (Del. 1999). This is evidenced by Defendants utilizing the exact same extortionate playbook to strip assets and seize control from founders at numerous other portfolio companies, including ChargeZoom, FinQuery, and AchieveIt.

29

139.    In executing their hostile takeover of SkillCycle, Defendants engaged in multiple, related predicate acts constituting racketeering activity, including:

- **Wire Fraud:** Fraudulently altering material terms of the Series A investment via email after signatures had been collected, utilizing electronic communications to execute a scheme to defraud;
- **Securities Fraud:** Improperly converting over four million preferred shares to common stock specifically to fraudulently manipulate corporate machinery, subvert corporate democracy, and seize board control;
- **Extortion:** Coercing Plaintiff into signing an oppressive separation agreement and forfeiting her equity by explicitly threatening her with fabricated, false criminal and civil fraud allegations. In addition, Defendants' extortionate tactics may have escalated to physical intimidation. For the past month prior to the date of this Complaint, a suspicious gray truck with tinted windows has been parked in Plaintiff's neighborhood. Retired police officers have explicitly alerted Plaintiff to this surveillance, causing her to reasonably fear that BIP is utilizing intimidation and stalking tactics to force her to drop this litigation; and
- **Witness Tampering and Obstruction:** Directing the interim CEO to conduct an unauthorized, secretive search of Plaintiff's previously deleted emails specifically to find "compromising" material, aiming to manufacture retroactive leverage or destroy exculpatory evidence.

140.    As a direct and proximate result of Defendants' pattern of racketeering activity, Plaintiff has suffered direct injuries to her property and business, including the loss of corporate control, the predatory dilution of her foundational equity, and severe reputational harm.

141.    Pursuant to 11 Del. C. § 1505(c), any person injured by reason of a violation of this chapter shall recover three times the actual damages sustained, along with punitive damages, attorneys' fees, and the costs of investigation and litigation.

## AS AND FOR A TENTH CAUSE OF ACTION
### Declaratory and Equitable Relief
### (Against All BIP Defendants)

142.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

143.    Under Delaware law, courts possess broad equitable powers to remedy breaches of fiduciary duty, corporate waste, and shareholder oppression by controlling shareholders. The Delaware

Supreme Court has explicitly confirmed these broad remedial powers to address fiduciary breaches, noting that the Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate. See Weinberger v. UOP, Inc., 457 A.2d 701, 714 (Del. 1983).

144.    As a direct result of the BIP Defendants' unlawful subversion of corporate democracy, manipulation of corporate machinery, and self-dealing transactions, Plaintiff has suffered severe and irreparable harm for which monetary damages alone cannot provide an adequate remedy at law.

145.    Specifically, the BIP Defendants engaged in predatory "pay-to-play" financing rounds and a hostile board coup that wrongfully diluted Plaintiff's foundational equity from approximately 80% to 4%. Furthermore, Defendants conducted an unauthorized, bad-faith search of Plaintiff's previously deleted email account to manufacture post hoc leverage against her.

146.    To rectify these egregious breaches of fiduciary duty and prevent further irreparable harm to both Plaintiff and the Company, Plaintiff is entitled to comprehensive equitable intervention.

147.    Accordingly, Plaintiff seeks the following equitable remedies under Delaware law:

- A declaratory judgment that the BIP Defendants breached their fiduciary duties as controlling shareholders of SkillCycle, Inc.
- Rescission of the bad-faith equity dilution transactions and forced "pay-to-play" financing rounds that unlawfully reduced Plaintiff's ownership.
- Restoration of Plaintiff's equity position in the Company to its status prior to the predatory dilution.
- Permanent injunctive relief strictly prohibiting the BIP Defendants from utilizing any information obtained through the improper and unauthorized search of Plaintiff's deleted email account.
- The immediate removal of all directors appointed by the BIP Defendants through the improper November 11, 2025 board coup.
- The appointment of independent directors to properly manage the Company and protect the interests of minority shareholders from further asset stripping and oppression.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff Kristy McCann respectfully demands judgment against Defendants BIP Ventures, L.P., BIP Ventures Management, LLC, Mark Buffington, and SkillCycle, Inc., as follows:

(i) On the first cause of action for Breach of Fiduciary Duty, brought derivatively on behalf of the Company, a judgment awarding SkillCycle, Inc. compensatory damages in an amount to be determined at trial for the diminished corporate value arising from the issuance of shares for inadequate consideration, as well as equitable relief to restore Plaintiff's equity position prior to the predatory dilution, plus punitive damages for Defendants' egregious and intentional wrongdoing;

(ii) On the second cause of action for Breach of Contract, a judgment awarding Plaintiff compensatory damages in an amount to be determined at trial for the invalid post-signature modifications to the Series A investment terms;

(iii) On the third cause of action for Breach of the Implied Covenant of Good Faith and Fair Dealing, a judgment awarding Plaintiff compensatory damages in an amount to be determined at trial;

(iv) On the fourth cause of action for Economic Duress, a judgment declaring the purported "for cause" termination justifications void and awarding Plaintiff compensatory damages;

(v) On the fifth cause of action for Defamation Per Se, a judgment awarding Plaintiff presumed damages, actual damages, and punitive damages for the intentional and malicious publication of false fraud accusations;

(vi) On the sixth cause of action for Gender Discrimination and Hostile Work Environment, a judgment awarding Plaintiff back pay, front pay, compensatory damages for emotional distress, and punitive damages;

(vii) On the seventh cause of action for Retaliation, a judgment awarding Plaintiff back pay, front pay, compensatory damages, and punitive damages;

(viii) On the eighth cause of action for Invasion of Privacy, a judgment awarding Plaintiff compensatory and punitive damages for the unauthorized, bad faith search of her deleted emails;

(ix) On the claims for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), a judgment awarding Plaintiff treble damages (three times the actual damages sustained), plus the costs of investigation and litigation, reasonably incurred;

(x) On the tenth cause of action for Declaratory and Equitable Relief, a judgment granting the following equitable remedies:

- A declaration that the BIP Defendants breached their fiduciary duties as controlling shareholders.
- Rescission of the bad faith equity dilution transactions and forced "pay-to-play" financing rounds that unlawfully reduced Plaintiff's ownership.
- Restoration of Plaintiff's equity position in the Company to its status prior to the predatory dilution.

32

- Permanent injunctive relief strictly prohibiting the BIP Defendants from utilizing any information obtained through the improper and unauthorized search of Plaintiff's deleted email account.
- The immediate removal of all directors appointed by the BIP Defendants through the improper November 11, 2025 board coup, and the appointment of independent directors to properly manage the Company and protect minority shareholders.
- An order requiring Defendants to issue a formal, board approved written corrective statement and reference letter to investors, employees, and third parties to remedy the reputational damage.

(xi) A judgment awarding Plaintiff pre-judgment and post-judgment interest, reasonable attorneys' fees, expenses, costs, and disbursements; and

(xii) Such other and further relief as the Court deems just, equitable, and proper.

### **JURY DEMAND**

Plaintiffs herein demand a trial by jury of all triable issues in the present matter.

**Dated:   April 16, 2026**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiffs*

**By: /s/ *Andrew T. Miltenberg***
**Andrew T. Miltenberg, Esq,**
**Stuart Bernstein, Esq.**
**Kimberly S. Courtney, Esq.**
**Kristen E. Mohr, Esq.**

**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

**amiltenberg@nmllplaw.com**
**sbernstein@nmllplaw.com**
**kcourtney@nmllplaw.com**
**kmohr@nmllplaw.com**